Petra ROJAS, Plaintiff,

v.

TEVA PHARMACEUTICALS USA, INC., et al, Defendants.

Civil Action No. 7:12–CV–193.

United States District Court,
S.D. Texas,
McAllen Division.

Feb. 21, 2013.

Kathryn Snapka, The Snapka Law Firm, Thomas J. Henry, Attorney at Law, Corpus Christi, TX, for Plaintiff.

Carla R. Pasquale, Jonathan L. Price, Nilda M. Tulla–Isidro, Goodwin Procter LLP, New York, NY, Richard A. Oetheimer, Goodwin Procter, LLP, Boston, MA, Michael A. Walsh, Strasburger Price LLP, Michael Alan Logan, Kane Russell Coleman Logan PC, Dallas, TX, David M. Melancon, Irwin Fritchie et al., New Orleans, LA, Leslie A. Benitez, Gordon & Rees, Michael R. Klatt, Attorney at Law, Austin, TX, Julie A. Callsen, Richard A. Dean, Tucker Ellis et al., Cleveland, OH, for Defendants.

## OPINION AND ORDER

MICAELA ALVAREZ, District Judge.

Pending before the Court is a self-styled motion to dismiss filed by Teva Pharmaceuticals USA, Inc. and Actavis Elizabeth, LLC.[1] After considering the motion, response, reply, record, and governing authorities, the Court **GRANTS** the motion.

### I. Background[2]

This case was originally filed in the 389th District Court, Hidalgo County, Tex-

---

1. Dkt. No. 32.

2. The Court notes at the outset that the Supreme Court in *PLIVA, Inc. v. Mensing,* ——

as, on February 28, 2011.[3] Petra Rojas ("Plaintiff") alleges she developed a neurological disorder known as tardive dyskinesia in approximately 2009 because she took Reglan/metoclopramide ("metoclopramide") for approximately ten years as prescribed by Doctor Behara.[4] Plaintiff sued Dr. Behara, some manufacturers of brandname metoclopramide, and some manufacturers of generic metoclopramide. The thirteen-page original petition alleges several theories of recovery ranging from negligence to fraud.[5]

Plaintiff did not serve some of the named defendants. Importantly, Plaintiff only served two manufacturers of generic metoclopramide: Teva Pharmaceuticals USA, Inc. and Actavis Elizabeth, LLC (collectively, "Generics").[6]

The state court, upon the agreement of all counsel, abated the case by order dated November 22, 2011.[7] On June 12, 2012, the state court, on Plaintiff's notice of nonsuit, dismissed Dr. Behara, the only nondiverse defendant.[8] The case was then removed to federal court.[9] Thereafter, the Court denied Plaintiff's motion to remand.[10]

On August 17, 2012, Generics filed a motion to dismiss.[11] After obtaining an extension of time to respond to the motion to dismiss, Plaintiff responded on October 5, 2012.[12] After obtaining leave of Court, Generics replied to Plaintiff's response on October 17, 2012.[13] Generics' motion to dismiss argues that all of Plaintiff's claims against Generics should be dismissed for failure to state a claim upon which relief may be granted.

Finally, on October 31, 2012, the parties who had appeared signed a stipulation of dismissal as to "Wyeth LLC; Wyeth Pharmaceuticals Inc., Individually and d/b/a ESI Lederle, Inc.; Wyeth Inc.; and Pfizer Inc." [14] (collectively, "Brands"). Therefore, only Generics remain as defendants in this case.

## II. Legal Standards

Because Generics filed their motion to dismiss after they answered, the Court will construe it as a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). "A motion for judgment on the pleadings under Rule 12(c) is subject to the same standard as a motion to dismiss under Rule 12(b)(6)." [15] "The ultimate question in a Rule 12(b)(6) motion is whether the complaint states a valid claim when all well-pleaded facts are assumed true and are viewed in the light most favorable to the plaintiff." [16] "A pleading that states a claim for relief must contain: ... (2) a short and plain statement of the claim showing that the pleader is entitled

U.S. ——, 131 S.Ct. 2567, 180 L.Ed.2d 580 (2011) expressly limited its analysis of federal law to the law as it existed prior to the 2007 amendments. *Id.* at 2574 n. 1. The Court is unaware of anything in the 2007 amendments that would alter the outcome in this case, and Plaintiff has not argued that 2007 amendments impact the outcome in this case.

3. Dkt. No. 1–2.

4. Dkt. No. 1–4.

5. Dkt. No. 1–4.

6. Dkt. No. 1–2.

7. Dkt. No. 1–14.

8. Dkt. No. 1–20.

9. Dkt. No. 1.

10. Dkt. Nos. 18 & 38.

11. Dkt. No. 32.

12. Dkt. Nos. 35, 37 & 48.

13. Dkt. Nos. 50, 51 & 52.

14. Dkt. No. 53.

15. *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir.2008) (citations omitted).

16. *Shandong Yinguang Chem. Indus. Joint Stock Co., Ltd. v. Potter*, 607 F.3d 1029, 1032 (5th Cir.2010) (citation omitted).

to relief...."[17] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[18] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[19] "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."[20]

To the extent that Plaintiff alleges fraud or misrepresentation, those claims are subject to the heightened pleading standards of Rule 9(b).[21] Rule 9(b) "requires that [a plaintiff] 'state with particularity the circumstances constituting the fraud.' 'Put simply, Rule 9(b) requires the who, what, when, where, and how to be laid out.'"[22]

## III. Analysis

The Court will begin its analysis by reviewing a recent Supreme Court decision that dealt with preemption of certain claims against generic manufactures of metoclopramide, then the Court will explore the interaction of *Mensing* and Texas products liability law, and finally the Court will evaluate whether Plaintiff has stated any claims that are not preempted.

## A. PLIVA, Inc. v. Mensing

As a threshold matter, the Court will address the elephant in the room, *PLIVA, Inc. v. Mensing*.[23] The Supreme Court handed down this opinion on June 23, 2011,[24] which was over a year before Plaintiff filed her response to the motion for judgment on the pleadings.

*Mensing* is strikingly similar to the case now before the Court. *Mensing* was a consolidation of lawsuits in which Gladys Mensing and Julie Demahy sued generic manufacturers of metoclopramide.[25]

> Each alleged, as relevant here, that long-term metoclopramide use caused her tardive dyskinesia and that the Manufacturers were liable under state tort law (specifically, that of Minnesota and Louisiana) for failing to provide adequate warning labels. They claimed that 'despite mounting evidence that long term metoclopramide use carries a risk of tardive dyskinesia far greater than that indicated on the label,' none of the [generic manufacturers] had changed their labels to adequately warn of that danger.[26]

The defendant generic manufacturers responded by arguing "that federal law preempted the state tort claims."[27]

The Supreme Court began its preemption analysis by identifying and comparing the state tort duties with the applicable

---

17. Fed.R.Civ.P. 8(a).

18. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

19. *Id.* (citing *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955).

20. *Id.* (citing *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955).

21. Fed.R.Civ.P. 9(b).

22. *Shandong Yinguang Chem. Indus. Joint Stock Co., Ltd. v. Potter*, 607 F.3d 1029, 1032 (5th Cir.2010) (quoting Fed.R.Civ.P. 9(b); *Benchmark Elec., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir.2003)).

23. —— U.S. ——, 131 S.Ct. 2567, 180 L.Ed.2d 580 (2011).

24. *Id.*

25. *Id.* at 2572–73.

26. *Id.* at 2573.

27. *Id.*

federal drug labeling requirements,[28] and highlighted various differences between the approval and labeling requirements of brand-name and generic drugs.[29] The opinion contrasted the complicated FDA approval process for new drugs with the approval process under the Hatch–Waxman Amendments for "'generic drugs' [which] can gain FDA approval simply by showing equivalence to a reference listed drug that has already been approved by the FDA."[30] The Supreme Court defined a "generic drug" as a "drug designed to be a copy of a reference listed drug (typically a brand-name drug), and thus *identical in active ingredients, safety, and efficacy.*"[31] Similarly, the majority contrasted the labeling duties of brand-name and generic drug manufacturers in seeking drug approval. "A brand-name manufacturer seeking new drug approval is responsible for the accuracy and adequacy of its label. A manufacturer seeking generic drug approval, on the other hand, is responsible for ensuring that its warning label is the same as the brand name's."[32]

The Supreme Court then turned to the issue of whether generic manufacturers were permitted to change their labels "*after* initial FDA approval."[33] The majority analyzed this issue under the principles of conflict preemption stating, "[w]here state and federal law 'directly conflict,' state law must give way"[34] and "[w]e have held that state and federal law conflict where it is 'impossible for a private party to comply with both state and federal requirements.'"[35] It is important to note that *Mensing* turned on the issue of conflict preemption—not express preemption. When the Supreme Court conducted a conflict preemption analysis in *Mensing*, it determined:

> We find impossibility here. It was not lawful under federal law for the [generic manufacturers] to do what state law required of them. And even if they had fulfilled their federal duty to ask for FDA assistance, they would not have satisfied the requirements of state law.

> If the [generic manufacturers] had independently changed their labels to satisfy their state-law duty, they would have violated federal law. Taking Mensing and Demahy's allegations as true, state law imposed on the [generic manufacturers] a duty to attach a safer label to their generic metoclopramide. Federal law, however, demanded that generic drug labels be the same at all times as the corresponding brand-name drug labels. Thus, it was impossible for the [generic manufacturers] to comply with both their state-law duty to change the label and their federal law duty to keep the label the same.[36]

Later in the opinion the Supreme Court further developed its analysis stating, "federal law would permit the [generic manufacturers] to comply with the state labeling requirements if, and only if, the FDA and the brand-name manufacturer changed the brand-name label to do so."[37] Mensing and Demahy argued that the generic manufacturers could not "bear their burden of proving impossibility because they did not even *try* to start the process that might

---

**28.** *Id.* at 2573–75.

**29.** *Id.* at 2573–76.

**30.** *Id.* at 2574 (citation omitted).

**31.** *Id.* at 2574 n. 2 (citations omitted) (emphasis added).

**32.** *Id.* at 2574 (citations omitted).

**33.** *Id.*

**34.** *Id.* at 2577 (citation omitted).

**35.** *Id.* (citation omitted).

**36.** *Id.* at 2577–78 (internal citations omitted).

**37.** *Id.* at 2578.

ultimately have allowed them to use a safer label."[38] The majority rejected this argument because "[t]he question for 'impossibility' is whether the private party could independently do under federal law what state law requires of it."[39]

In the wake of *Mensing*, it is clear that state laws requiring generic drugs to have different labels than the FDA-approved brand-name labels are preempted. In order to understand the full implications of *Mensing*, it is necessary to review the definition of labeling in the prescription drug context.

> Brochures, booklets, mailing pieces, detailing pieces, file cards, bulletins, calendars, price lists, catalogs, house organs, letters, motion picture films, film strips, lantern slides, sound recordings, exhibits, literature, and reprints and similar pieces of printed, audio, or visual matter descriptive of a drug and references published (for example, the "Physicians Desk Reference") for use by medical practitioners, pharmacists, or nurses, containing drug information supplied by the manufacturer, packer, or distributor of the drug and which are disseminated by or on behalf of its manufacturer, packer, or distributor are hereby determined to be labeling as defined in section 201(m) of the act.[40]

Thus, *Mensing* covers a wide variety of communications regarding prescription drugs.

## B. Plaintiff's Claims

The Court will now consider whether Plaintiff has stated any claims that survive the motion for judgment on the pleadings. The Court notes that Plaintiff's complaint is lacking in factual details and is conclusory. Even separate and apart from the preemption issues, it is doubtful the complaint would survive judgment on the pleadings. Furthermore, Plaintiff's response to the motion for judgment on the pleadings suffers from the same problem yet adds allegations that are not supported by the original petition. Nonetheless, in Plaintiff's response, she explicitly seeks leave to amend the complaint. Because Plaintiff has not previously amended her complaint, the Court interprets the response as both a motion to amend the complaint and a proposed amendment. Therefore, the Court will consider whether any of Plaintiff's claims, *as amended by Plaintiff's response,* survive the motion for judgment on the pleadings.

### 1. *Mensing* Preempts Most Theories of Recovery

Turning to the case at bar, Plaintiff's complaint (as amended by the response) alleges several theories of recovery, but they all arise out of the alleged injury to Petra Rojas caused by her alleged use of metoclopramide. In an "Agreed Order to Abate" the parties characterized this case as a "product liability case."[41] After considering the complaint, the Court agrees that despite the multiple causes of action asserted by Plaintiff, this is a products liability case, with the claim arising from a failure to warn. More specifically, Plaintiff claims that Generics failed to warn, in

38. *Id.* at 2578–79.

39. *Id.* at 2579 (citing *Wyeth v. Levine,* 555 U.S. 555, 573, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009)).

40. 21 C.F.R. § 202.1(*l*)(2); *see also, Del Valle v. PLIVA, Inc.,* Civ. No. B:11–113, 2011 WL 7168620, at *4 (S.D.Tex. Dec. 21, 2011) ("In essence, virtually all communication with medical professionals concerning a drug constitutes labeling.") (citing 21 C.F.R. § 202.1(*l*)(2), *adopted sub nom. Del Valle v. Qualitest Pharm. Inc.,* 2012 WL 2899406 (S.D.Tex. June 22, 2012)).

41. Dkt. No. 1–14 at p. 2.

one form or another, that long-term use of metoclopramide causes tardive dyskinesia.

As this case is before the Court based on diversity, the Court applies Texas products liability law. In Texas,

'[p]roducts liability action' means any action against a manufacturer or seller for recovery of damages arising out of personal injury, death, or property damage allegedly caused by a defective product whether the action is based in strict tort liability, strict products liability, negligence, misrepresentation, breach of express or implied warranty, or any other theory or combination of theories.[42]

■ Furthermore, Texas follows the § 402A Restatement (Second) of Torts approach to strict products liability.[43] Section 402A states:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.[44]

The Texas Supreme Court has explained the ways a product may be unreasonably dangerous. "[A] product may be unreasonably dangerous because of a defect in marketing, design, or manufacturing." [45]

■ A failure to warn, the focus of this case, is a type of marketing defect.[46] As stated above, *Mensing* makes clear that any state laws requiring Generics' labeling to deviate from the FDA-approved brand labeling (as that term is broadly defined in this context) are preempted and the Court grants judgment on the pleadings for Generics on those claims.

■ Furthermore, Plaintiff cannot prevail on a theory that Generics failed to adequately test their product. Simply put, there is a causation problem. Even assuming that testing by Generics would have uncovered the dangers of long-term metoclopramide use earlier, that knowledge would only be helpful to the extent that it was communicated through labeling. But *Mensing* establishes that Generics were not in a position to unilaterally change the labeling associated with the metoclopramide that they were producing. Therefore, like Demahy and Mensing's claim that generic manufacturers have a duty to request a strengthened label from the FDA,[47] this inadequate testing claim is precluded by *Mensing*. The Court notes that this analysis is unchanged by Plaintiff's new allegation that Generics failed to adopt the 2004 FDA-approved labeling.[48] Specifically, Plaintiff does not allege that

---

**42.** Tex. Civ. Prac & Rem.Code Ann. § 82.001(2) (Vernon Supp.2011–2012).

**43.** *FFE Transp. Servs., Inc. v. Fulgham,* 154 S.W.3d 84, 87 (Tex.2004).

**44.** Restatement (Second) of Torts § 402A (1965).

**45.** *Am. Tobacco Co., Inc. v. Grinnell,* 951 S.W.2d 420, 426 (Tex.1997) (citations omitted).

**46.** *Id.* at 426 (citations omitted).

**47.** *PLIVA, Inc. v. Mensing,* — U.S. —, 131 S.Ct. 2567, 2576–77, 180 L.Ed.2d 580 (2011).

**48.** Dkt. No. 48 at p. 10.

the failure to adopt the 2004 labeling was in any way based on inadequate testing. On the contrary, Plaintiff alleges that Generics knew that their label was not compliant.[49] The Court grants judgment on the pleadings for Generics on Plaintiff's inadequate testing claim.

## 2. Theories of Recovery That Potentially Remain

The Court now considers those claims that may survive the above analysis. To survive the motion for judgment on the pleadings, a claim must be both legally possible and supported by facts alleged in the complaint.

### a. Manufacturing Defect

■ Plaintiff's complaint alludes to a manufacturing defect.[50] "A manufacturing defect exists 'when a product deviates, in its construction or quality, from the specifications or planned output in a manner that renders it unreasonably dangerous.'"[51] The Court finds that the complaint contains no more than conclusory allegations that there was a manufacturing defect. Accordingly, the Court grants judgment on the pleadings for Generics on Plaintiff's manufacturing defect claim.

### b. Failure to Withdraw Metoclopramide From the Market

In Plaintiff's response to the motion for judgment on the pleadings, she directs the Court to *Bartlett v. Mutual Pharmaceutical Co., Inc.* in which the First Circuit found that a generic defendant "*certainly can choose not to make the drug at all.*"[52] The Court disagrees with *Bartlett*. The Supreme Court in *Mensing* found that state laws requiring the labels of generic manufacturers to differ from FDA-approved label conflicted with federal law. Similarly, a state law requirement that the drug be completely withdrawn from the market because it is impossible to comply with both the federal and state law requirements law, would also impermissibly conflict with federal law and be preempted. Therefore, the Court grants judgment on the pleadings for Generics on any claims based on Generics' failure to withdraw metoclopramide from the market.

### c. Design Defect

■ Plaintiff also asserts that there was design defect. For a plaintiff to prevail on a design defect claim under Texas law, she "must prove that there is a safer alternative design."[53] "In the absence of a safer alternative, a product is not unreasonably dangerous as a matter of law."[54] Here, Generics were obliged to use a certain design. In *Mensing* the Supreme Court stated:

> [G]eneric drugs can gain FDA approval simply by showing equivalence to a reference listed drug that has already been approved by the FDA. This allows manufacturers to develop generic drugs inexpensively, without duplicating the clinical trials already performed on the equivalent brand-name drug. A generic drug application must also show that the [safety and efficacy] labeling proposed

---

**49.** Dkt. No. 48 at p. 10.

**50.** Dkt. No. 1–4 at p. 9.

**51.** *BIC Pen Corp. v. Carter*, 346 S.W.3d 533, 540 (Tex.2011) (internal quotation and citation omitted).

**52.** Dkt. No. 48 at p. 6 (citing *Bartlett v. Mut. Pharm. Co. Inc.*, 678 F.3d 30, 37 (1st Cir. 2012)).

**53.** *Brockert v. Wyeth Pharm. Inc.*, 287 S.W.3d 760, 769 (Tex.App.-Hous. [14th Dist.] April 14, 2009, no pet.) (citing *Gen. Motors Corp. v. Sanchez*, 997 S.W.2d 584, 588 (Tex.1999); *Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 384 (Tex.1995)).

**54.** *Id.* (citing *Caterpillar*, 911 S.W.2d at 384).

... is the same as the labeling approved for the [brand-name] drug.[55]

Therefore, Generics were required to produce a drug that was equivalent to the brand-name drug and were not free to unilaterally pursue a safer alternative design in order to comply with state law. Above, the Court noted that it was not persuaded by the First Circuit's recent opinion in *Bartlett v. Mutual Pharmaceutical Co., Inc.*[56] The Court now takes this opportunity to point out that *Bartlett* is readily distinguishable from the case at hand because, unlike Texas law, New Hampshire law does not require a plaintiff to demonstrate that there was safer alternative design in order to prevail on a design defect claim.[57] Plaintiff's design defect claim is preempted, and therefore the Court grants judgment on the pleadings for Generics on that claim.

### d. Fraud and Misrepresentation

■ Plaintiff alleges that Generics committed fraud. Quite simply, Plaintiff's allegations of fraud and misrepresentations fall far short of Rule 9(b)'s particularity requirement. The Court grants judgment on the pleadings for Generics on Plaintiff's fraud and misrepresentation claims.

### e. Off–Label Promotion

In her response, Plaintiff asserts that Generics promoted and marketed metoclopramide "in a manner *inconsistent* with the FDA-mandated label and for off-label purposes[.]"[58] Plaintiff cites *Whitener v. PLIVA, Inc.*,[59] but it is readily distinguishable because *Whitener* dealt with off-label use of metoclopramide by a pregnant woman to treat morning sickness. Here, Plaintiff's alleged off-label promotion was for use of metoclopramide for more than twelve weeks. That allegation is indistinguishable from the failure to warn claims addressed elsewhere in this opinion. The Court will not address it separately.

### f. Failure to Update the Labeling

In Plaintiff's response, she alleges that *Mensing* does not preempt all of her claims because she has made state law claims that are not in conflict with federal law. In particular, Plaintiff alleges that Generics failed to update their labeling in 2004 as required by the FDA and failed to communicate that change to prescribers.[60] Because the "labeling" is defined so broadly in this context, the Court will address both as a failure-to-update-the-labeling claim. Plaintiff further alleges that state law claims that are based on the Generics' failure to update their labeling in accordance with federal law are not preempted. Here, the Court need not reach the issue of whether the Plaintiff's failure-to-update-the-labeling claims are preempted because Plaintiff has not stated a claim under state law for a failure to warn based on the alleged failure to update the label.

Recently in *Centocor, Inc. v. Hamilton*, a prescription drug case, the Texas Supreme Court found: "In sum, the crux of the [Plaintiffs'] claims rests on [Defendant's] alleged failure to provide an adequate warning of the potential risks and side effects associated with [the prescription drug]."[61] Similarly, the Court finds

---

**55.** *PLIVA, Inc. v. Mensing,* —— U.S. ——, 131 S.Ct. 2567, 2574, 180 L.Ed.2d 580 (2011) (internal citations and quotation marks omitted).

**56.** 678 F.3d 30 (1st Cir.2012).

**57.** *Id.* at 35–36.

**58.** Dkt. No. 48 at p. 9.

**59.** Civ. No. 10–1552, 2011 WL 6056546 (E.D.La. Dec. 6, 2011).

**60.** Dkt. No. 48 at pp. 7–10.

**61.** *Centocor, Inc. v. Hamilton,* 372 S.W.3d 140, 169 (Tex.2012).

that in this case all of Plaintiff's remaining claims, even if labeled as "failure to update," are premised on an alleged failure to warn.

Specifically, Plaintiff's allegations are deficient because they fail to address the learned intermediary doctrine. In *Centocor*, the Texas Supreme Court explained the following about the learned intermediary doctrine:

> Under the learned intermediary doctrine, the manufacturer of a pharmaceutical product satisfies its duty to warn the end user of its product's potential risks by providing an adequate warning to a 'learned intermediary,' who then assumes the duty to pass on the necessary warnings to the end user. In this case, we consider the applicability of the learned intermediary doctrine to a patient's claims against a prescription drug manufacturer, whose product allegedly caused a serious injury. We hold that the doctrine generally applies within the context of a physician-patient relationship and allows a prescription drug manufacturer to fulfill its duty to warn end users of its product's potential risks by providing an adequate warning to the prescribing physician. We further hold that the court of appeals erred by creating an exception to the learned intermediary doctrine for direct-to-consumer (DTC) advertising. Although the patient alleged various common law causes of action, all of the patient's claims turn on the prescription drug manufacturer's failure to warn. Therefore, the learned intermediary doctrine applies to all of the patient's claims, and the patient was required to show that an inadequate

warning to the prescribing physicians caused the patient's injuries. Because the patient presented no evidence that the allegedly inadequate warning was a producing cause of her physicians' decisions to prescribe the prescription drug, her claims fail as a matter of law.[62]

In *Centocor*, The Texas Supreme Court also elaborated on the "producing cause" requirement. "But when the prescribing physician is aware of the product's risks and decides to use it anyway, any inadequacy of the product's warning, as a matter of law, is not the producing cause of the patient's injuries."[63] Crucially, "when the plaintiff received the [prescription] drug through the existence of a physician-patient relationship[,]"[64] the learned-intermediary doctrine is not an affirmative defense. Instead, it must be addressed by the plaintiff.[65]

■ In this case, Plaintiff's failure-to-update-the-labeling and any other remaining failure to warn claims are inadequate. First, in her response, Plaintiff fails to mention her doctor in relation to her failure-to-update-the-labeling allegations. Instead she makes global allegations that Generics did not communicate the 2004 labels to the medical community. In short, she makes nothing more than conclusory allegations that Generics breached a duty to her doctor. Furthermore, Plaintiff makes no allegations that her doctor was unaware of the side effects of metoclopramide. On the contrary, in her original complaint, Plaintiff alleges that Dr. Behara knew or should have known of the side effects of metoclopramide. Thus, even if Plaintiff had sufficiently alleged that Ge-

---

**62.** *Centocor, Inc. v. Hamilton*, 372 S.W.3d 140, 142–43 (Tex.2012) (internal citation omitted).

**63.** *Centocor, Inc. v. Hamilton*, 372 S.W.3d 140, 170 (Tex.2012), reh'g denied (Aug. 17, 2012) (citation omitted).

**64.** *Id.* at 166 & n. 26.

**65.** *Id.* at 164–66.

nerics breached their duty to Dr. Behara, Plaintiff makes nothing more than conclusory allegations that such breach caused her injury.

The Court finds that the learned intermediary doctrine applies in this case, but that Plaintiff has failed to plead facts that would allow her to prevail. Therefore, the Court grants judgment on the pleadings for Generics on Plaintiff's failure-to-update-the-labeling claims and any other claims that are not explicitly addressed elsewhere in this opinion.

### g. Implied Warranty

In Plaintiff's response she states:

The Generic Defendants were aware that chronic MCP usage was unsafe and that their label was not compliant with the FDA-mandated label change. However, the Generic Defendants allowed the drug to be continued to be sold, which is **tantamount to warranting** that the drug was safe and effective for long-term usage. By failing to do what federal law required it to do (change their labels to conform with the 2004 version), the Generic Defendants warranted something that was not true.[66]

After considering Plaintiff's allegations, the Court finds that Plaintiff's implied warranty claims are indistinguishable from the failure to warn claims addressed earlier in this opinion. To the extent Plaintiff's implied warranty claim is not preempted, it is subject to the learned intermediary doctrine and inadequately pleaded. Therefore, the Court grants judgment on the pleadings for Generics on Plaintiff's implied warranty claims.

### h. DTPA

Plaintiff alleges that Generics violated the Deceptive Trade Practices—Consumer Protection Act ("DTPA").[67] The Court has already found that Generics are entitled to judgment on the pleadings for all the other claims in the complaint. After examining Plaintiff's DTPA claims, it is clear that they are based on the same underlying allegations; Plaintiff's DTPA claims are either conclusory or preempted in light of *Mensing.* Therefore, the Court grants judgment on the pleadings for Generics on the DTPA claims.

## IV. Conclusion

After considering the motion, response, reply, record, and governing authorities, the Court **GRANTS** Generics' motion for judgment on the pleadings in its entirety.

IT IS SO ORDERED.

---

66. Dkt. No. 48 at p. 10 (emphasis added).

